THOMAS FAY, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

CARRIERS: Interstate Commerce—Liability for Damages under
1 Carmack Amendment—Rules of Federal Court Control. Since the enactment of the Carmack Amendment, Sec. 7, Pars. 11 and 12, Ch. 3591, 34 St. at L. 595 (Secs. 8604a, 8604aa, U. S. Comp. St.), all questions relating to the liability of a common carrier for a loss or damage of interstate shipments are to be determined thereunder, and by the rules declared by the Federal court, all regulations and policies of the particular state upon the subject having been superseded by state legislation.

CARRIERS: Interstate Commerce—Binding Effect of Contract Pro-
2 visions. The design of the Carmack Amendment was to avoid

the possibility of discrimination by the carrier in dealing with shippers, and a carrier cannot waive a contract provision requiring all claims for damages or delay to be made in writing within four months, as to do so would open the way to preferences and discriminations between shippers.

CARRIERS: Interstate Commerce—Shelling Corn in Transit—Negligence. An interstate carrier's tariff provision that corn might be shelled in transit, and a notation that corn shipped was to be shelled in transit, were only directions as to how the shipment was to be handled, and did not constitute a contract that the carrier should·shell it.

CARRIERS: Interstate Commerce—Shelling Corn in Transit—Nonliability of Carrier. Evidence reviewed, and held insufficient to support an instruction that a defendant interstate carrier, through its agent, had held itself out to the plaintiff as having adequate and sufficient shelling facilities for corn at a certain point, or had contracted or arranged for such shelling.

*Appeal from Johnson District Court.*—R. P. HOWELL, Judge.

### JULY 1, 1919.

ACTION for damages consequent on delay in shipping corn by plaintiff from Oxford, Iowa City, and Tiffin to Chicago, Illinois, over the defendant's line of railway, resulted in the verdict against the defendant and judgment thereon. Both parties appeal, defendant's appeal being first perfected.—*Reversed.*

*F. W. Sargent, Messer, Clearman & Olson,* and *J. H. Johnson,* for appellant.

*Ball & Ball,* and *F. A. Cooper,* for appellee.

LADD, C. J.—I. The plaintiff was engaged in the business of buying and shipping corn to Chicago, Illinois, over the defendant's line of railway from Tiffin, Oxford, and Iowa City, and having it shelled en route at Davenport. Ten carloads were shipped during August and September. The dates of delivery of the corn to defendant, by it to the

Davenport Elevator Company to be shelled, the return by it to defendant, and its arrival in Chicago, are as follows:

| Car No. | Delivered To Deft. | Reached Davenport. | Elevator Company Notified. | Elevator Co. Finished Shelling. | Arrived in Chicago. |
|---|---|---|---|---|---|
| | 1912 | 1912 | 1912 | 1912 | 1912 |
| 64206 | Aug. 20 | Aug. 24 | Aug. 26 | Sept. 16 | Sept. 25 |
| 120665 | Sept. 5 | Sept. 5 | Sept. 5 | Oct. 4 | Oct. 7 |
| 36588 | Aug. 31 | Sept. 4 | Sept. 4 | Sept. 27 | Oct. 2 |
| 11844 | Aug. 30 | Sept. 3 | Sept. 3 | Sept. 19 | Sept. 22 |
| 202077 | Sept. 3 | Sept. 7 | Sept. 7 | Oct. 2 | Oct. 4 |
| 61036 | Sept. 4 | Sept. 7 | Sept. 7 | Oct. 2 | Oct. 7 |
| 201141 | Sept. 9 | Sept. 23 | Sept. 23 | Oct. 17 | Oct. 21 |
| 122478 | Sept. 11 | Sept. 13 | Sept. 13 | Sept. 13 | Oct. 19 |
| 103990 | Sept. 13 | Sept. 21 | Sept. 21 | Oct. 19 | Oct. 22 |
| 2480 | Aug. 30 | Sept. 20 | Sept. 20 | Oct. 15 | Oct. 25 |

The parties agreed that the ordinary or usual time for transporting this corn from the various stations to Chicago was at that time five days, and when billed "Stop to shell at Davenport," seven days, when there was no delay in shelling the corn. It was further agreed that all claims for damages consequent on delay were filed within four months after the several cars arrived at their destination, except cars Nos. 11844, 202077, and 61036, and that claims on these three cars were not filed in writing with the defendant until September 21, 1913. All of the bills of lading were of standard form, approved by the interstate commerce commission, containing the clause "that claims for loss, damage or delay must be made in writing to the carrier at the point of delivery or at the point of origin within four months after delivery of the property, or, in case of failure to make delivery, then within four months after reasonable time for delivery has elapsed." The plaintiff

appealed from the order of the court reject-
ing the claim for damages because of the

1. CARRIERS : in-
terstate com-
merce : liability
for damages
under Car-
mack Amend-
ment : rules
of Federal
court control.

delay of the three cars last mentioned, con-
tending, as. was pleaded, that the defendant
had waived the limitation above set out.
He relies on *Hudson & Co. v. Northern Pac.
R. Co.*, 92 Iowa 231, and other like decisions.

Since the enactment of the Carmack Amendment by
Congress, all questions relating to a common carrier, lia-
bility for loss, or damage to interstate shipments are to be
determined thereunder and by the rules declared by the Fed-
eral court, this legislation having superseded all regula-
tions and policies of a particular state upon the subject.
*Missouri, K. & T. R. Co. v. Harriman*, 227 U. S. 657 (57
L. Ed. 690). The decisions relied upon were rendered prior
to that time, and for this reason are not controlling. The

2. CARRIERS : in-
terstate com-
merce : binding
effect of con-
tract provisions.

design of that amendment was to avoid all
possibility of discrimination by the carrier
in dealing with shippers. That to permit
waiver would open the door to preference
seems self-evident. In *Phillips Co. v. Grand

Trunk W. R. Co.*, 236 U. S. 662 (59 L. Ed. 774), the point
considered was whether a carrier might waive a statute of
limitations relative to the filing of claims with the inter-
state commerce commission, and with reference thereto, the
court said :

"The obligation of the carrier to adhere to the legal
rate, to refund only what is permitted by law, and to treat
all shippers alike, would have made it illegal for the car-
riers, either by silence or by express waiver, to preserve to
the Phillips Company a right of action which the statute re-
quired should be asserted within a fixed period. To have
one period of limitation where the complaint is filed before
the commission, and the varying periods of limitation of
the different states, where a suit was brought in a court of
competent jurisdiction, or to permit a railroad company

to plead the statute of limitations as against some and to waive it as against others, would be to prefer some and discriminate against others, in violation of the terms of the Commerce Act, which forbids all devices by which such results may be accomplished. The prohibitions of the statute against unjust discrimination relate, not only to inequality of charges and inequality of facilities, but also to the giving of preferences by means of consent judgments or the waiver of defenses open to the carrier. The railroad company, therefore, was bound to claim the benefit of the statute here."

There, a statutory limitation was involved, while here, it is one by contract; but neither may be avoided, under the Interstate Commerce Act, by the "giving of" preferences by means of consent judgments or the.waiver of defenses open to the carriers. The precise point was covered in *Georgia, F. & A. R. Co. v. Blish Milling Co.*, 241 U. S. 190 (60 L. Ed. 948), where the claim was based on the misdelivery of and injury to flour shipped, and the contention was that the limitation clause was inapplicable, and that the carrier, in making misdelivery, converted the flour, and thus abandoned the contract. The court, after deciding that this clause might not be obviated by the mere form of the action, observed, with reference to abandoning the contract, that:

"The parties could not waive the terms of the contract under which the shipment was made, pursuant to the Federal act; nor could the carrier, by its conduct, give the shipper the right to ignore these terms which were applicable to that conduct, and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act, and open the door to the very abuses at which the act was aimed."

See,.also, *Chicago & A. R. Co. v. Kirby*, 225 U. S. 155

(56 L. Ed. 1033, Ann. Cas. 1914A, 501); *Olivet Bros. v. Pennsylvania R. Co.*, 88 N. J. L. 241 (96 Atl. 582) ; *Banaka v. Missouri Pac. R. Co.*, 193 Mo. App. 345 (186 S. W. 7).

Under the rule of equality, as sought to be established by the Carmack Amendment, the carrier may not say to one shipper, "I will insist on the strict observance of the clause requiring you to file your claim within four months," and to another, "I will release you entirely from that requirement." Surely, this would be waiving a defense open to the carrier, and a discrimination as between shippers. Whether the carrier might estop itself from raising the defense, by misleading the shipper prior to the expiration of the time limit within which notice must be given, we have no occasion to decide, as the point is not raised by pleading or in brief. *Emery & Co. v. Wabash R. Co.*, 183 Iowa 687, has no application; for the ruling of *In the Matter of Bills of Lading*, 29 Interst. Com. Com'n. Rep. 417, was not pleaded, introduced in evidence, or in any way called to the attention of the district court, and it was not required to take judicial notice of the order contained therein. *Robinson v. Baltimore & O. R. Co.*, 222 U. S. 506 (56 L. Ed. 288, 289). There was no error in withdrawing the claims for damages consequent on delay in transporting the corn in three of the cars.

II.   The petition contains two counts concerning the shipment of each carload, one praying for damages in consequence of a breach of the contract in the shipment, and the other for damages owing to negligence in carrying out the terms of the contract. In each of these counts, it is alleged that the defendant, in the bill of lading, undertook to haul over its line a car "of ear corn and to shell the same at Davenport, Iowa, and to deliver the same to plaintiff's commission merchant * * * at Chicago, Ill."

3. CARRIERS : interstate commerce : shelling corn in transit : negligence.

The defendant argues that, if so, and if it undertook to shell the corn, this was illegal, for that it was not covered by the schedule or tariff of rates filed with the Interstate Commerce Commission, and posted as required by law in defendant's depot or freighthouse. It appears that the schedule or tariff did contain the following clauses:

"(A) Wheat, corn, rye, oats, or barley, originating at stations on the Chicago, Rock Island & Pacific Railway, or connecting lines, as specifically provided in Item No. 22, may be cleaned, milled, malted, or manufactured; grain or grain products may be mixed; corn may be shelled; seeds may be cleaned or mixed in transit at any station on the Chicago, Rock Island & Pacific Railway on and east of the Missouri River, and the product forwarded to ultimate destination on the following basis:

"(B) Current tariff rates applicable on the commodity as forwarded from transit station,—figured from original point of shipment of grain or its products or seeds to ultimate destination,—plus following additional charge for out of line or back haul, if any."

This merely permits the shipper to have his corn shelled en route, but does not obligate the carrier to do the shelling. If the carrier had this done, it was merely acting as the shipper's agent in so doing. · Nothing in the clause quoted nor in the nature of defendant's business indicated that it undertook to shell the corn. Nor do the rates charged warrant such an inference. The notation that the corn was to be shelled at Davenport was no more than a direction how the shipment was to be handled, and did not constitute a contract that defendant would shell it. Moreover, the amount paid the Davenport Elevator Company for shelling the corn was added to the freight charges, as found in the schedule, and both were paid by the commission merchant acting for plaintiff, and with the commission deducted from the proceeds of the corn. This advised plaintiff that shelling of the corn was treated as distinct from the car-

riage, and, as will later appear, plaintiff had no reason
for supposing, if he so did, that defendant was engaged in
the business of shelling corn. For these reasons, we con-
cur in the trial court's ruling that the contract did not pur-
port to require defendant to shell the corn. This disposes
of the point raised by defendant that a railroad company
engaged in interstate commerce may not contract to shell
corn en route or otherwise.

III. The jury was told that, if the defendant was
merely an agent of plaintiff to have the corn shelled, and
did not undertake to do so itself, it would not be responsible
for any delay by the Davenport Elevator
**4. CARRIERS : in-**
**terstate com-**
**merce : shelling**
**corn in transit :**
**nonliability of**
**carrier.**
Company, "unless the plaintiff has shown
you, by a preponderance of the evidence,
that the defendant, through its agents or
employees, had, for a number of years prior
to and during the time of the shipments in controversy,
*held itself out to the plaintiff as having adequate and suffi-*
*cient shelling facilities at Davenport, Iowa, or that it had*
*contracted or arranged for such shelling, and* would under-
take to provide for the shelling of the corn shipped over
its line from the points at which the corn in controversy
was shipped, if it was so desired by the shipper, and that
the plaintiff relied upon these representations in shipping
the corn in controversy.   *   *   *"

The correctness of this instruction is challenged for
that, as is said, the record is without evidence to support it.
The evidence is undisputed that the Davenport Elevator
Company operated the only cornsheller on the direct line of
defendant's railway from the shipping points named to
Chicago; that the defendant had no interest whatever there-
in; that, upon the arrival of the several cars of corn in
Davenport, it promptly notified the elevator company that
the carloads were there, ready to be shelled; that, upon re-
ceiving notice from the elevator company, the cars were

placed upon the track where desired by it, and were removed. therefrom as soon as notice was received that the corn was shelled; that the bills for shipping the corn were immediately presented to the railway company, which advanced the price and added the same to its freight charges, and these were paid by the consignee and, upon the sale of the corn, were, with the commission merchant's commission, deducted from the proceeds of the corn, and the balance remitted by said merchant to plaintiff. There was nothing in the method of dealing, then, to mislead plaintiff into supposing that the defendant was shelling the corn, or was doing otherwise than getting this done for the shipper. Nor was there anything in the tariff schedule, or, as we have seen, in the endorsement and shelling, to mislead anyone into thinking that the railway company actually shelled the corn, or acted otherwise than in behalf of the shipper. The only other evidence bearing thereon is that of plaintiff that he learned "how to ship ear corn from the Rock Island agent at Iowa City eight years ago or longer."

"Q. Just tell the jury how you came to do that?  A. I wanted to ship some ear corn, and I have heard of it being shelled in transit; so I went to the Rock Island depot and asked the agent if they had any shellers that shelled corn in transit, and the agent told me he didn't know of any just then,—they used to have one at Nichols Station; but he would look it up. In the meantime, he looked it up. When I got ready to ship, when I came in, they billed it out to stop at Davenport to shell. Q. Who told you?  A. Some of the Rock Island agents,—I can't remember just who it was. Q. How did he tell you to bill it?  A. He marked it himself. Q. Since that time, I will ask you whether or not you have been in the habit of sending corn to be shelled en route?  A. Yes, often. Q. Were you at any time told by the railroad company or any of its officers, prior to the time you shipped these cars in question in this

case, as to who did the shelling at Davenport?  A. No.
Q. Did you ever know?  A. No."

A former agent of defendant's testified that:

"When a person wanted to ship a car of corn to be
shelled in transit, he would come in and inquire about shell-
ing arrangement. There was a tariff which gives the rules
and regulations to show where corn can be shelled in tran-
sit: for instance, like Chicago. My recollection is, in ship-
ping to Chicago, corn would be shelled at Davenport."

Cross-examination: "All of these matters I have been
testifying about were covered by the tariffs. When people
would come in and want to know what arrangement they
could make about shelling in transit, I would look up the
tariffs."

This is all of the evidence bearing on whether defend-
ant's employees held out the idea that it had adequate or
sufficient shelling facilities at Davenport, or had contract-
ed or arranged for such shelling. That it is utterly insuf-
ficient to warrant such an inference is too clear for argu-
ment. Nothing was said as to its facilities, and no one
even intimated the existence of a contract or arrangement
for doing it. Of course, that the corn could or would be
shelled in transit was to be inferred; but further than this
does not appear, and no other implication is open than
that defendant would procure this to be done in plaintiff's
behalf. Because of the error in this instruction, the judg-
ment must be and is—*Affirmed* on plaintiff's appeal; *Re-
versed* on defendant's appeal.

EVANS, PRESTON, and SALINGER, JJ., concur.